UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80113-CR-MARRA/MATTHEWMAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

AARON JOHNSON,

    Defendant.

_____/

FILED by _____ D.C.

SEP 05 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT AND RECOMMENDATION ON DEFENDANT AARON JOHNSON'S MOTION TO SUPPRESS EVIDENCE

THIS CAUSE is before the Court pursuant to an Order of Reference from United States District Judge Kenneth A. Marra [DE 25]. Before the Court is Defendant Aaron Johnson's Motion to Suppress Evidence [DE 23], filed July 25, 2012. The United States has filed a response [DE 31], an evidentiary hearing was held on August 30, 2012, and the matter is now ripe for review and disposition.

### I.    Procedural Background

On June 12, 2012, a grand jury sitting in the Southern District of Florida returned a one-count Indictment charging Johnson with being a felon in possession of a firearm in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1). On July 25, 2012, Johnson moved to suppress evidence of the firearm, asserting that the traffic stop that led to its recovery was an unlawful seizure in violation of the Fourth Amendment to the United States Constitution

1

[DE 23]. The Government responded that officers had probable cause to believe that Johnson violated the law on at least three fronts, and the traffic stop was therefore constitutional [DE 31].

## II. Evidentiary Hearing

An evidentiary hearing was held before the undersigned on August 30, 2012. The parties made opening statements and then proceeded to present their evidence. The United States called three witnesses: Deputy Sheriff Daniel Frend, Deputy Sheriff Terry Sneed, and Deputy Sheriff Israel Baez III, all of the Palm Beach County, Florida Sheriff's Office ("PBSO"). The Government also introduced a DVD containing a video of the traffic stop as its Exhibit 1. Rokela Russell testified on behalf of Johnson. At the conclusion of Russell's testimony, the parties rested. Counsel then made closing arguments, and the matter was submitted.

## III. Findings of Fact

The following findings of fact are based on the evidence presented at the aforementioned evidentiary hearing and the undersigned's assessment of the credibility of the witnesses. On April 28, 2012, PBSO's "Street Team" unit was conducting surveillance on Johnson. Surveillance was being conducted on Johnson because Johnson was known to be a member of the "Dogs Under Fire" gang and a person of interest in several gang-related shootings in the Belle Glade, Florida area. On this date, the Street Team unit consisted of Deputies Sneed, Allen, and Baez, as well as Sergeant Carn.

Terry Sneed, a Deputy Sheriff with the PBSO, was stationed in an unmarked vehicle outside of Russell's apartment complex, the Palm Glade Apartments, located in the 2000 Block of South Main Street in Belle Glade. At approximately 7:30 P.M. on April 28, 2012, Sneed first observed a shirtless Johnson come down the stairs from the 900 building of the apartment

2

complex carrying a white bag. Johnson went to the rear of a gold or tan Ford Focus with New York license plate number AMT-3099 ("the Focus"), smoked a cigarette and then donned a white shirt. Sneed next observed a black female, who he assumed was Johnson's girlfriend, exit the same building of the apartment complex. Johnson and the female got into the Focus, with Johnson in the driver's seat and the female in the front passenger's seat. Sneed, who was watching Johnson from approximately 15 yards away with binoculars through his open passenger door window, did not see Johnson put on a seat belt as he entered the Focus. Johnson and the female then drove off. After radioing his fellow officers that Johnson was leaving the apartment complex, Sneed momentarily lost sight of the Focus. A few minutes later, as Sneed was about to exit the apartment complex and turn onto South Main Street, he saw the Focus behind him and observed, in his rear view mirror, that Johnson was not wearing a seat belt. At this point, Johnson's vehicle was directly behind Sneed's and both vehicles were proceeding slowly because of an upcoming speed bump. Sneed relayed this information to other members of the Street Team unit over the police radio, saying something to the effect of, "If you want to do a traffic stop, he's not wearing a seat belt. That's all I have on that vehicle right now." At the time of Sneed's observations, the sun had not yet set, it was not raining, and visibility was clear.

Deputy Baez was stationed in an unmarked vehicle at the 1400 block of South Main Street. After Sneed radioed that Johnson had left the complex, Baez began driving in an attempt to locate the Focus. While Baez was stopped at the intersection at the 900 Block of Southwest Martin Luther King Boulevard, he saw the Focus. Johnson made a left hand turn in front of him onto Southwest 9th Street, whereupon Baez observed that Johnson was not wearing a seat belt. Baez also saw Rokela Russell, who he knew to be Johnson's girlfriend, in the passenger seat of Johnson's vehicle.

3

After Sneed's transmission, other members of the Street Team unit, including Sergeant Carn and Deputy Baez, discussed whether to initiate a traffic stop of Johnson's vehicle. At some point, the decision was made to initiate a traffic stop, and the Street Team unit put out a call over the police radio, requesting that a marked PBSO vehicle initiate a stop of Johnson's car. Deputy Frend, in a marked K-9 patrol unit, responded that he would initiate the stop. At approximately 7:44 P.M., Frend initiated a traffic stop of the Focus, and the Focus pulled into a residential driveway and stopped. Frend exited his vehicle, and Johnson quickly jumped out of the Focus. Frend ordered Johnson back inside the Focus, and Johnson complied. Frend then approached the Focus and spoke with Johnson. Johnson eventually exited the Focus with his hands up. Frend placed Johnson up against the driver's side door of the Focus and conducted a pat down search. He then led Johnson to the rear of the Focus and placed him in handcuffs. Frend then recovered a firearm from Johnson's right rear pocket. The traffic stop was conducted in twilight—it was not bright and sunny, but not yet dark.

A video recording of the traffic stop shows Frend following a tan-colored compact vehicle with the New York license plate AMT-3099. *See* DE 39, Gov't.'s Ex. 1. The tan vehicle eventually stops in a residential driveway, *id.* at 00:32, and Frend's vehicle stops behind it. *Id.* at 00:35–00:36. Less than a second after Frend stops his vehicle, Defendant Johnson, wearing a white shirt, gets out of the tan vehicle and stands up,[1] only to look back in Frend's direction and then sit back down in his own vehicle. *See id.* at 00:37–00:39. Frend then approaches the tan vehicle with his weapon drawn, *id.* at 00:44, while the passenger door opens and closes, *id.* at 00:45–00:48. Frend then looks into the driver's side door, *id.* at 00:48, and appears to converse with the driver, Johnson. *Id.* at 00:50–01:19. Johnson then steps out of the tan vehicle with his

---

[1] The rapidity with which Johnson exited the vehicle supports an inference that he was not wearing a seat belt at the time of the traffic stop.

4

hands up, whereupon Frend places him up against the side of the tan vehicle, conducts a pat down search, leads him to the rear of the vehicle, and places him in handcuffs. *See id.* at 01:20–02:17. Frend then reaches into Johnson's right rear pocket and recovers what appears to be a firearm. *See id.* at 02:18–02:25. The Court finds the video of the traffic stop corroborates Deputy Frend's testimony and establishes that at the time of the stop, there was sufficient daylight for deputies to observe a traffic violation such as driving without a seat belt.

After Johnson was handcuffed, PBSO officers ran the Focus' license plate number and learned that it matched no record. After the officers were unable to identify the Focus' registration information with a license plate check, Deputy Baez conducted a query of the Focus' Vehicle Identification Number[2] through a police database and learned that the vehicle had been reported stolen.

At the time Frend stopped Johnson's vehicle: (1) Johnson was not wearing a seat belt; (2) there was a valid judicially-imposed "no-contact" order between Johnson and Russell; (3) Johnson and Russell were in the vehicle together; (4) Johnson held only a Class E learner's license and not a full driver's license; and (5) Russell's driver's license was suspended. Members of the PBSO Street Team knew each of these facts before Frend initiated a traffic stop of the Focus.

### IV. Discussion

The Fourth Amendment protects the right of individuals to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Where government agents obtain evidence in

---

[2] A Vehicle Identification Number, or VIN, is a "series of Arabic numbers and Roman letters which is assigned to a motor vehicle for identification purposes." 49 C.F.R. §§ 565.12(r); 565.22(o) (2011).

violation of a person's Fourth Amendment rights, that evidence may not ordinarily be used against that person in a criminal prosecution. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). Warrantless searches and seizures are presumptively unreasonable, unless the government can show that they fit into one of a few narrowly-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 356–57 (1967).

### A. Relevant Florida Law

In Florida, it is unlawful to operate a motor vehicle unless the operator is restrained by a safety belt. Fla. Stat. § 316.614 (2012). A person who holds a Class E learner's license may only operate a motor vehicle when accompanied by a licensed driver, 21 years of age or older, who sits in the front passenger seat while the vehicle is in operation. Fla. Stat. § 322.1615 (2012). Finally, under Florida law, in a domestic violence case, the court may issue a so-called "no contact" order prohibiting a person from, *inter alia*, telephoning, contacting, or communicating with the victim. *See id.* § 741.30; *Gill v. Gill*, 50 So. 3d 772, 774 (Fla. Dist. Ct. App. 2010). Willful violation of a domestic violence protective order is a first-degree misdemeanor punishable by up to a year in jail. *See* Fla Stat. §§ 741.31, 775.082 (2012).

### B. Traffic Stop

Johnson's Fourth Amendment claim centers on the propriety of Frend's stop of the Focus. Here, Johnson does not contend that his roadside detention was unduly prolonged. Rather, he argues only that the stop itself was unreasonable because the officers had no basis for a lawful traffic stop in the first place. A police officer may conduct a traffic stop where he or she has probable cause to believe that a traffic violation has occurred. *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (citing *Whren v. United States*, 517 U.S. 806, 812 (1996)). This

6

is solely an objective inquiry—"[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis."[3] *Whren*, 517 U.S. at 813. *Accord United States v. Harris*, 526 F.3d 1334, 1338–39 (11th Cir. 2008). Thus, the Court need not delve into whether or not a traffic violation was the officer's true motivation for the traffic stop. On the contrary, the probable cause inquiry is relatively straightforward: objectively viewed, did the PBSO deputies have probable cause to believe that Johnson had committed a violation of law? If so, the stop was constitutional; if not, it violated the Fourth Amendment.

### C. Collective Knowledge Doctrine/Fellow Officer Rule

Although Deputy Frend did not actually observe Johnson driving without wearing a seat belt, he initiated the traffic stop at the request of members of the PBSO Street Team unit, at least two of whom, Deputy Sneed and Deputy Baez, did observe Johnson driving without a seat belt. Additionally, although Deputy Frend had no personal knowledge of the status of Johnson or Russell's driving privileges or the existence of the no-contact order prior to the traffic stop, Deputy Baez did possess such information. And before conducting the traffic stop, Deputy Frend learned from other officers that Johnson was not wearing a seat belt, that he was driving in violation of the terms of his license, and that he was in violation of a valid no-contact order.

Under the collective knowledge doctrine, or "fellow officer" rule, an officer may assume probable cause exists where he receives information to that effect from other officers. *United States v. Hensley*, 469 U.S. 221, 232–33 (1985); *United States v. Lyons*, 687 F.3d 754, 765–67

---

[3] This differs from the situation where a defendant alleges that officers practiced selective enforcement against him based on a constitutionally impermissible factor, such as race or ethnicity. As the Supreme Court has noted, such challenges are more appropriately categorized as Equal Protection violations rather than Fourth Amendment violations. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Johnson asserts no such equal protection claim; nor do the facts suggest such a violation.

(6th Cir. 2012); *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985); *United States v. Astling*, 733 F.2d 1446, 1460 (11th Cir. 1984); *United States v. Olmedo*, 552 F.Supp.2d 1347, 1357–58 (S.D. Fla. 2008). *See also United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam) (reasonable suspicion to be determined from "collective knowledge of the officers"); *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998) (fact that task force officers who ordered stop by radio had reasonable suspicion to believe defendant was carrying drugs satisfied requirements for investigative stop); *United States v. Kreimes*, 649 F.2d 1185, 1189 (5th Cir. Unit B Jul. 1981) ("[W]here there is at least minimal communication[] between officers, we look to the 'collective knowledge' of all officers in assessing [a reasonable suspicion] determination"). *See generally Whiteley v. Warden*, 401 U.S. 560, 568 (1971) (officers called to aid in execution of arrest warrants entitled to assume officers requesting warrant based application on probable cause); *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) (discussing fellow officer rule in qualified immunity context); *Lippman v. City of Miami*, 724 F.Supp.2d 1240, 1255 (S.D. Fla. 2010) (Marra, J.) (same). In other words, each of the officers investigating a crime need not be aware of the facts supporting probable cause to effectuate a traffic stop, as long as the information supporting probable cause is within the officers' "collective knowledge."

Here, it was. Deputy Baez knew that Johnson had only a restricted driver's license and that Russell's license was suspended. Baez also saw Russell and Johnson in the Focus together and noted that Johnson was not wearing a seat belt. Baez also knew that a no-contact order had been issued by a state court judge and confirmed that it was in force on April 28, 2012, the day of the stop. In addition, Deputy Sneed credibly testified that he observed Johnson in his rear

view mirror without a seat belt.[4]  Based on the credible testimony of the Deputy Sheriffs, the undersigned finds that the PBSO Street Team unit had probable cause to believe that Johnson was violating three different Florida laws.  Accordingly, the Court finds that the traffic stop of the Focus was based on probable cause and did not violate Johnson's Fourth Amendment rights.

Moreover, even if the deputies did not have probable cause to conduct a traffic stop of Johnson's vehicle, the Court finds that the stop still passes constitutional muster because they had *reasonable suspicion* that Johnson had violated the traffic laws or was involved in some other criminal activity.  *Harris*, 526 F.3d at 1337; *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003).  *See also Terry v. Ohio*, 392 U.S. 1 (1968).  Although reasonable suspicion and probable cause are often confused, they are not the same.  Neither standard is "readily, or even usefully, reduced to a neat set of legal rules," *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation omitted), but it is generally agreed that reasonable suspicion is a less demanding standard than probable cause.  *See Delaware v. Prouse*, 440 U.S. 648, 654 & n.11 (1979).  *See also United States v. Lyons*, 687 F.3d 754, 763 & n.3 (6th Cir. 2012) ("Reasonable suspicion requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard").  Here, members of the Street Team unit observed

---

[4] This testimony was contradicted by Johnson's witness Rokela Russell, who testified that both she and Johnson were wearing seat belts when they were stopped by Frend.  But it was corroborated by Deputy Baez, who also independently observed that Johnson was not wearing a seat belt.  On this issue of fact, the Court finds the deputies' testimony more credible than Russell's.  Russell had a difficult time answering many of the questions put to her, appeared evasive or confused at times, and admitted that Johnson had financially and emotionally supported her and her children.  Thus, Russell had a strong motive to protect Johnson.  Moreover, it is important to remember that the standard here is not whether Johnson was *actually* wearing a seat belt, but whether the officers reasonably believed that he was not wearing one.  *See United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment.").

Johnson driving without a seat belt and knew he possessed only a Class E learner's license. They saw him in a vehicle with Russell, who they knew had a suspended license and who they knew Johnson was lawfully barred from contacting. They reasonably suspected that Johnson was violating three different Florida laws and were constitutionally permitted to conduct a detention of reasonable scope and duration—in this case, a traffic stop—to investigate further. In sum, the stop of Johnson was constitutionally permissible because it was based on both probable cause and reasonable suspicion.

### D. Inevitable Discovery

Alternatively, the Government argues that even if the officers did not have probable cause to effectuate a traffic stop, the firearm should not be suppressed because the deputies would have inevitably discovered it once they figured out that Johnson was driving a stolen vehicle. As noted above, the usual remedy for a Fourth Amendment violation is the exclusion of evidence. But where there is a reasonable probability that the tainted evidence would have later been discovered by constitutional means, the evidence need not be suppressed. *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004). Under the inevitable discovery rule, the burden is on the government to show that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the [unconstitutional] conduct." *Id.* In light of its finding that the officers had probable cause and reasonable suspicion to effectuate the traffic stop, the Court need not reach this issue.

### IV. Conclusion

For the foregoing reasons, it is respectfully recommended that Defendant's Motion to Suppress [DE 23] be **DENIED**. The parties are hereby advised that any objections to this Report

and Recommendation must be filed in writing with the presiding District Judge within 14 days. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2).

**DONE and SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this **5th** day of September, 2012.

*William Matthewman*
WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE